Thomas W. McKAY and Leticia McKay, Plaintiffs,

v.

**NOVARTIS PHARMACEUTICALS CORPORATION, Defendant.**

**No. EP–06–CA–63–FM.**

United States District Court, W.D. Texas, El Paso Division.

Feb. 10, 2012.

---

Francisco X. Dominguez, Dominguez & Coyle, P.L.L.C., El Paso, TX, John J. Vecchione, John J. Vecchione Law, PLLC, Fairfax, VA, for Plaintiffs.

Joe G. Hollingsworth, Donald R. McMinn, Katharine R. Latimer, Robert E. Johnston, Hollingsworth, LLP, Washington, DC, Mark N. Osborn, Kemp Smith LLP, El Paso, TX, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART NOVARTIS PHARMACEUTICALS CORPORATION'S DAUBERT MOTION TO EXCLUDE CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS IN THE MCKAY CASE

FRANK MONTALVO, District Judge.

On this day, the court considered "Novartis Pharmaceuticals Corporation's ["NPC"] *Daubert* Motion to Exclude Causation Testimony of Plaintiffs' Experts in the *McKay* Case" ("Motion to Exclude"), filed June 10, 2011 in the Middle District of Tennessee as part of a multi-district litigation; Thomas W. McKay ("McKay") and Leticia McKay's (collectively "the McKays") "Plaintiffs' Response in Opposition to Novartis Pharmaceuticals Corporation's *Daubert* Motion to Exclude Causa-

tion Testimony of Plaintiffs' Experts in the *McKay* Case" ("Response"), filed July 20, 2011; and "Novartis Pharmaceuticals Corporation's Reply in Support of *Daubert* Motion to Exclude Causation Testimony of Plaintiffs' Experts in the *McKay* case" ("Reply"), filed August 8, 2011. NPC requests the court to exclude all causation testimony of the McKays' retained and non-retained experts in this case. For the reasons set forth below, the court will grant in part and deny in part NPC's Motion to Exclude.

## I. BACKGROUND

### A. Procedural History

The McKays brought suit against NPC in this court on February 15, 2006, alleging that two of NPC's drugs—Aredia and Zometa—caused McKay osteonecrosis of the jaw ("ONJ"). The McKays brought claims for strict liability, negligence, breach of express warranty and breach of implied warranty. On May 24, 2006, this case was transferred to the Honorable Todd J. Campbell of the Middle District of Tennessee as a "tag-along" case to *In Re Aredia and Zometa Products Liability Litigation*, MDL No. 1760, and was individually styled therein as 3:06–cv–527. On December 22, 2006, the McKays filed an amended complaint, adding a failure to warn claim and a loss of consortium claim.[1] On July 25, 2008, Judge Campbell granted NPC partial summary judgment, dismissing the McKays' failure to warn claim.[2] On July 6, 2011, Judge Campbell rejected the McKays' request for reconsideration of the failure-to-warn issue.[3] NPC filed a summary judgment motion to dispose of the McKays' remaining claims on June 10, 2011.[4] On August 23, 2011, the McKays'

case was remanded back to this court with NPC's Motion to Exclude and motion for summary judgment pending.

### B. Factual Background

Aredia and Zometa are biphosphonates used to treat bone disorders. Aredia was first approved by the FDA in 1991 to treat hypercalcemia of malignancy, and was approved in 1996 to treat bone metastases in patients with breast cancer. In 2002 the FDA approved Zometa for a number of conditions, including bone metastases.

McKay was diagnosed with prostate cancer in 1997. The parties apparently dispute whether that cancer metastatized to McKay's bones. In 1997 he was prescribed Aredia, to be administered intravenously for osteoporosis, although the FDA had not approved the drug for that purpose. McKay took Aredia for several years, and was later prescribed Zometa as well. At some point McKay developed severe jaw and dental problems, including non-healing tooth extraction sites and exposed bones. He was diagnosed with ONJ, a condition marked by dead and dying bone in the jaw.

### C. Parties' Arguments

NPC seeks to exclude testimony by Dr. Richard A. Kraut ("Dr. Kraut"), the McKays' retained expert, as well as testimony by McKay's eight treating physicians in various fields, on the question of whether Aredia and Zometa caused McKay's ONJ. As to Dr. Kraut, NPC argues that he is unqualified to offer an opinion on general causation, incorporating by reference its motion addressing that issue from the multi-district case of *Hill v. Novartis Pharmaceuticals Corp.*, 3:08–cv–

---

1. *See* 3:06–md–1760, ECF No. 223.

2. *See* 3:06–cv–527, ECF No. 29.

3. *See id.* ECF No. 62.

4. *Id.* ECF No. 58.

934, which is docketed as ECF No. 3864 in 3:06–md–1760. In that motion, NPC argued that Dr. Kraut was unqualified to serve as an expert because of his limited experience in treating Aredia and Zometa users with ONJ. Further, NPC argued that Dr. Kraut's testimony that Aredia and Zometa can cause ONJ was inadmissible because it relied on case reports and secondary studies based on case reports, which NPC argued are unreliable for purposes of establishing causation. Relatedly, NPC argued that Dr. Kraut's methodology in reaching his general causation opinion was insufficiently scientific, because he relied on those reports and studies in coming to his opinion.

In its Motion to Exclude presently before this court, NPC also argues that Dr. Kraut should not be allowed to testify on the issue of specific causation; that is, regarding McKay's ONJ in particular. In support of this position, NPC argues that Dr. Kraut's methodology in reaching the conclusion that Aredia and Zometa caused McKay's ONJ was unreliable. NPC characterizes Dr. Kraut's testimony on that question as *ipse dixit,* and further argues that Dr. Kraut failed to perform a differential diagnosis to rule out other possible causes of McKay's ONJ.

As to McKay's treating physicians, NPC offers a variety of reasons for their testimony on causation to be excluded. For reasons explained below, the court will focus solely on two such physicians—Drs. Michael Sitters ("Dr. Sitters") and Robert Leibowitz ("Dr. Leibowitz")—for the purposes of this Order. Mirroring its argument regarding Dr. Kraut, NPC argues that Dr. Sitters's specific causation testimony is unreliable to the extent that his opinion was derived in part from reports that do not conclusively establish general causation. Additionally, NPC argues that Dr. Sitters did not perform a sufficiently reliable differential diagnosis. NPC argues that Dr. Leibowitz is unqualified to offer his opinion on causation because he has no background or training in dentistry or oral surgery and because he did not diagnose McKay with ONJ.

In their Response, the McKays apparently concede that six of the eight treating physicians are unqualified to offer causation testimony. They argue, instead, that Dr. Kraut, Dr. Sitters, and Dr. Leibowitz should be able to offer opinions on specific causation. The multi-district litigation panel ruled several times that Dr. Kraut's causation testimony was admissible as to other multi-district litigation plaintiffs, and the McKays urge the court to follow that path. They maintain that the alleged deficiencies in Dr. Kraut's methodologies identified by NPC go to the weight, rather than the admissibility, of his testimony. The McKays also contend that Dr. Kraut did perform a differential diagnosis.

The McKays argue that Dr. Sitters is qualified to offer an opinion on causation because he is an oral maxillofacial surgeon who has done extensive research on ONJ, because he diagnosed McKay with ONJ, and because he ruled out other possible causes of McKay's ONJ. Additionally, they point to Dr. Sitters's explanation that his causation opinion is supported by radiographs.

In addressing the propriety of allowing Dr. Leibowitz to testify on causation, the McKays do not meet NPC's arguments head-on. Instead, they reference many things that do not appear relevant to the present inquiry. They do, however, note Dr. Leibowitz's extensive experience in dealing with Aredia and Zometa as an oncologist, and his familiarity with and study of ONJ and biphosphonates' association with that condition.

## II. *APPLICABLE LAW*

The Federal Rules of Evidence provide that a sufficiently qualified expert

may testify in a case in order to provide the kind of knowledge that "will help the trier of fact to understand the evidence or to determine a fact in issue."[5] Generally, "an expert is permitted wide latitude to offer opinions, including those not based on firsthand knowledge or observation."[6] For expert testimony to be admissible, however, it must be relevant,[7] and have "a reliable basis in the knowledge and experience of [the relevant] discipline."[8] The trial judge plays a "gatekeeping" role in admitting expert testimony; and in that capacity has wide discretion to decide whether the testimony is reliable as well as "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."[9] While the Supreme Court has provided some guidance on how to determine an expert's reliability under certain circumstances,[10] it has acknowledged that "[t]oo much depends upon the particular circumstances of the particular case at issue" to set out rigid requirements to test reliability.[11]

## III. DISCUSSION

### A. Dr. Ambrose Aboud, Dr. Robert Bucy, Dr. Nathan Dickerson, Dr. Luis Loweree, Dr. Jorge Ramos and Dr. Panagiotis Valilis

In addition to arguing for the exclusion of Drs. Kraut, Sitter, and Leibowitz's cau-

sation testimony, NPC argues that the court should not allow Drs. Ambrose Aboud, Robert Bucy, Nathan Dickerson, Luis Loweree, Jorge Ramos or Panagiotis Valilis to testify on the causation issue for a variety of reasons. In their Response, the McKays effectively concede the point. Of McKay's treating physicians, they argue that "Dr. Sitters and Dr. Leibowitz should be able to testify directly as cause experts on Mr. McKay's BRONJ[,]"[12] and that the other treating physicians should be allowed to testify on matters other than causation.[13] Accordingly, the court will grant NPC's Motion to Exclude as unopposed as to Drs. Ambrose Aboud, Robert Bucy, Nathan Dickerson, Luis Loweree, Jorge Ramos and Panagiotis Valilis. The other matters for which the McKays seek to introduce testimony from those doctors are not the subject of NPC's motion, and the court expresses no opinion at this time on the admissibility of such testimony.

### B. Dr. Kraut

#### 1. Qualifications

■ NPC argues that Dr. Kraut lacks the qualifications to be an expert in this case, but the court finds otherwise. Dr. Kraut is board certified in oral medicine, oral and maxillofacial surgery, and dental anesthesia, and has practiced in those fields since 1975, holding numerous promi-

---

5. Fed.R.Evid. 702(a).

6. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

7. Fed.R.Evid. 402; *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786.

8. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786).

9. *Id.* at 152, 119 S.Ct. 1167.

10. *See id.* (referencing *"Daubert's* specific factors").

11. *Id.* at 150, 119 S.Ct. 1167.

12. "BRONJ" stands for biphosphonate-induced osteonecrosis of the jaw.

13. Resp. at 21.

nent positions over that time.[14] He has treated several patients with ONJ, and has conducted research and published papers regarding the relationship between biphosphonates and ONJ.[15] The multi-district litigation panel repeatedly held that Dr. Kraut's credentials qualify him as an expert,[16] and this court will follow suit.

### 2. *General Causation*

■ In order for Dr. Kraut's causation opinions to be admissible under Federal Rule of Evidence 702 ("Rule 702"), they must be "based on sufficient facts or data;" must be derived using "reliable principles and methods;" and must apply those principles and methods to the facts in a reliable manner.[17] In exercising its gatekeeping function, the court must not consider Dr. Kraut's conclusions themselves, but rather the manner in which he arrived at those conclusions.[18] Applying that standard, the court finds both Dr. Kraut's general and specific causation testimony to be admissible.

In arriving at his opinion regarding biphosphonates' capacity to cause ONJ in general, Dr. Kraut relied on observations from his own practice, as well as "two landmark publications in the Journal of Oral and Maxillofacial Surgery" that addressed the association between biphosphonates and ONJ.[19] Additionally, he relied on "a series of position papers issued by the American Association of Oral and Maxillofacial Surgeons."[20] NPC challenges Dr. Kraut's general causation testimony as unreliable because, it argues, such papers are insufficient to establish causation. Specifically, the papers from the American Association of Oral and Maxillofacial surgeons discuss the "association" between biphosphonates and ONJ and expressly disclaim a conclusive finding of causation. And, case reports do not employ certain mechanisms of rigorous scientific testing, such as controls. Accordingly, NPC argues that those papers do not constitute sufficient facts or data within the meaning of Rule 702 to give rise to a general causation opinion.

Although those materials do not definitively establish a causal connection between biphosphonate use and ONJ, Dr. Kraut may nonetheless reasonably rely on them for that proposition.[21] As the Supreme Court has recognized, "[t]rained experts commonly extrapolate from existing data."[22] While it is true that—for the reasons identified by NPC—those papers do not *compel* the conclusion that biphosphonates cause ONJ, they certainly *support* that conclusion. For example, the American Association of Oral and Maxillofacial surgeons recognizes that the available data demonstrates:

1) a positive correlation between biphosphonate potency and risk for developing

---

14. *See* Dr. Kraut's Expert Report at 1, attached to NPC's Mot. to Exclude as Exhibit 32.

15. *Id.* at 2.

16. *See, e.g., In re Aredia and Zometa Prods. Liab. Litig.*, 2010 WL 5071063, *2 (M.D.Tenn. Dec. 7, 2010); *In re Aredia and Zometa Prods. Liab. Litig.*, 2010 WL 5071851, *2 (M.D.Tenn. Dec. 7, 2010).

17. Fed.R.Evid. 702(b, d).

18. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

19. Dr. Kraut's Expert Report at 1–2.

20. *Id.* at 2.

21. *See Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty.").

22. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

BRONJ; 2) a negative correlation between biphosphonate potency and duration of biphosphonate exposure prior to developing BRONJ; and 3) a positive correlation between duration of biphosphonate exposure and developing BRONJ.[23]

Accordingly, Dr. Kraut's testimony on general causation undoubtedly amounts to more than "unsupported speculation." [24]

Further, Dr. Kraut's methodology in using the available medical literature to derive his general causation opinion satisfies the applicable *Daubert* tests for reliability. Specifically, it is a commonly used technique for determining the causal relationship between biphosphonates and ONJ, and it is one both capable of and subject to peer review.[25] For the past several years, doctors have repeatedly relied on case studies to evaluate the possible causal connection between biphosphonate use and ONJ. The history of this litigation itself makes that fact apparent.[26] Although reliance on such studies may not be sufficiently widespread as to be generally accepted in the scientific community, the fact that many doctors have based causation opinions on those studies weighs in favor of

finding that method to be reliable.[27] Additionally, the reliability of deriving a finding of causation from those case reports has been independently evaluated.[28] Particularly, Wayne A. Ray, Ph.D. submitted an expert report in this case specifically addressing the propriety of relying on case reports, explaining how the specific reports at issue can reliably support a finding of causation.[29]

Accordingly, the court finds Dr. Kraut's expert testimony regarding general causation to be admissible under Rule 702. This holding is consistent with the multidistrict litigation panel's repeated findings that Dr. Kraut and others may testify on causation, and with other courts' treatment of the issue upon remand from the panel. To the extent NPC wishes to expose weaknesses in Dr. Kraut's general causation opinion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." [30]

### 3. *Specific Causation*

■ Dr. Kraut's specific causation opinion is similarly based on a reliable

**23.** Salvatore Ruggiero, et al., *AAOMS Position Paper on Biphosphonate–Related Osteonecrosis of the Jaws—2009 Update*, J. Oral Maxillofacial Surgery, at 2 (2009).

**24.** *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir.2009) ("The [expert] testimony must be 'ground[ed] in the methods and procedures of science' and 'more than subjective belief or unsupported speculation.' ") (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786).

**25.** *See id.* (listing the *Daubert* factors for evaluating the reliability of methodology) (citation omitted).

**26.** *See generally*, *Deutsch v. Novartis Pharmaceuticals Corp.*, 768 F.Supp.2d 420, 429–34 (E.D.N.Y.2011) (evaluating, after remand from the multi-district litigation panel, the

propriety of several experts' reliance on epidemiologic studies to establish causation).

**27.** *See Daubert*, 509 U.S. at 594, 113 S.Ct. 2786 (recognizing that the degree to which a method is accepted in the scientific community can be helpful in evaluating the reliability of that method).

**28.** *See id.* at 593, 113 S.Ct. 2786 ("Another pertinent consideration [in evaluating a method's reliability] is whether the theory or technique has been subjected to peer review and publication.").

**29.** *See* Rebuttal Report of Wayne A. Ray, Ph. D., filed under seal in 3:06–cv–527 at ECF No. 72.

**30.** *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786 (citation omitted).

foundation. NPC's characterization of that opinion as *ipse dixit* and NPC's claim that Dr. Kraut did not perform a differential diagnosis are belied by the record. In his expert report, Dr. Kraut ruled out the two other possible causes of McKay's ONJ. Specifically, he ruled out osteoradionecrosis—ONJ caused by radiation—because McKay did not have radiation therapy to his jaw.[31] He also ruled out osteomyelitis because of McKay's "lack of fever, lack of separation at any point and the natural course the necrosis has followed." [32] At his deposition, Dr. Kraut explained in detail the reasons that McKay's clinical course was inconsistent with osteomyelitis.[33] Dr. Kraut also explained in his deposition that he did not include in his differential diagnosis Fosamax—a biphosphonate that McKay also took—because it is significantly less potent than Aredia and Zometa.[34] Further, Dr. Kraut testified that he did not include the chemotherapy drug Decadron or corticosteroids in his differential diagnosis because in his experience, and based on his review of the literature, those drugs have never been associated with ONJ absent biphosphonate use, and thus were not significant variables.[35]

The Fifth Circuit has held that eliminating viable alternatives is a reliable method of determining causation.[36] While NPC challenges the sufficiency of Dr. Kraut's differential diagnosis, the court finds it to be well-considered and comprehensive. Therefore, Dr. Kraut's testimony that Aredia and Zometa caused McKay's ONJ is admissible. NPC may, of course, attempt to raise doubts about Dr. Kraut's conclusions by introducing alternative theories of causation or attempting to poke holes in Dr. Kraut's differential diagnosis, but the appropriate venue to do so is the trial; not a challenge to the admissibility of Dr. Kraut's testimony.[37]

## C. Dr. Sitters

NPC argues for the exclusion of Dr. Sitters's causation testimony for a variety of reasons. Primarily, NPC challenges the admissibility of his testimony because he disclaimed expertise in ONJ and because his differential diagnosis was inadequate. Neither argument is persuasive, and the court finds Dr. Sitters's testimony to be admissible.

 To be qualified as an expert under Rule 702, a witness must have "knowledge, skill, experience, training or education" that "will help the trier of fact." [38] Although Dr. Sitters testified that he is not an expert in ONJ, his background is nevertheless more than sufficient to assist the trier of fact in this case. He is an oral and maxillofacial surgeon with nearly thirty years of experience.[39] He has diagnosed multiple patients with biphosphonate-induced ONJ,[40] he has reviewed the medical

---

**31.** Dr. Kraut's Expert Report at 5.

**32.** *Id.*

**33.** *See* Dr. Kraut Dep. at 108, attached to ECF No. 57 as Exhibit 10 in 3:06–cv–527.

**34.** *See id.* at 67.

**35.** *Id.* at 69–71.

**36.** *See Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 248 (5th Cir.2002).

**37.** *See Wackman v. Rubsamen,* 602 F.3d 391, 403 (5th Cir.2010) (observing that analytical " 'gaps' go to the weight of the evidence" as opposed to its admissibility) (citation omitted).

**38.** Fed.R.Evid. 702(a).

**39.** Sitters Dep. at 128; attached to ECF No. 67 as Exhibit 1 in 3:06–cv–527.

**40.** *Id.* at 144–45.

literature on biphosphonate drugs,[41] and he has written a paper on oral biphosphonates and ONJ.[42] Thus, he is a witness with sufficiently "specialized knowledge" to be an expert, here.[43]

■ Further, Dr. Sitters's testimony is based on a reliable foundation. Dr. Sitters's deposition testimony makes clear that he extensively reviewed the available medical literature on ONJ and biphosphonates. Therefore, for the reasons set out in the section on Dr. Kraut, above, Dr. Sitters has a reliable basis for an opinion on general causation. Dr. Sitters also has a reliable basis to testify on the issue of specific causation. He based his diagnosis of biphosphonate-induced ONJ on the clinical course McKay followed.[44] Like Dr. Kraut, Dr. Sitters ruled out radiation-induced osteonecrosis because McKay did not have radiation therapy to his jaw, and he ruled out osteomyelitis secondary to infection because McKay did not present with indications of an infection.[45]

Dr. Sitters did testify that he could not rule out nonsuppurative osteomyelitis without performing a biopsy, and he did not perform one.[46] Dr. Sitters further testified, however, that he did not perform a biopsy because it would have made McKay's condition worse.[47] In fact, the record shows that a panel of experts assembled by NPC specifically recommended against performing a biopsy.[48] Accordingly, the methodology Sitters employed in arriving at his conclusion that biphosphonates caused McKay's ONJ appears to be consistent with the "level of intellectual rigor" practiced in the field.[49] The possibility that a biopsy might reveal nonsuppurative osteomyelitis is an issue NPC may raise to challenge the weight—not the admissibility—of causation testimony from Dr. Sitters.[50]

### D. Dr. Leibowitz

■ The McKays do not carry their burden of showing Dr. Leibowitz's causation testimony to be admissible.[51] NPC argues that Dr. Leibowitz may not testify about the cause of McKay's ONJ because he did not diagnose him with that condition and because he is not trained in dentistry or oral surgery. Although Dr. Leibowitz is an oncologist who has extensive experience with prescribing Zometa and Aredia and has written informally about biphosphonate-induced ONJ, there is no indication in the record that Dr. Leibowitz ever independently determined a cause for McKay's ONJ. While the McKay's claim in their Response that Dr. Leibowitz diag-

---

41. *Id.* at 27.

42. *Id.* at 132.

43. *See* Fed.R.Evid. 702(a).

44. *See* Sitters Dep. at 97–98.

45. *See id.* at 132–33.

46. Sitters Dep. at 86; attached to ECF No. 57 as Exhibit 17 in 3:06–cv–527.

47. Sitters Dep. at 135; attached to ECF No. 67 as Exhibit 1 in 3:06–cv–527.

48. *See* Dr. Leibowitz, *Biphosphonates and Osteonecrosis of the Maxilla and/or Mandible (Jaw Bones),* at 8; attached to ECF No. 67 as Exhibit 16 in 3:06–cv–527.

49. *See Wells v. SmithKline Beecham Corp.,* 601 F.3d 375, 378 (5th Cir.2010) (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)) (internal quotation marks omitted).

50. *See Wackman v. Rubsamen,* 602 F.3d 391, 403 (5th Cir.2010).

51. *See Bocanegra v. Vicmar Servs., Inc.,* 320 F.3d 581, 585 (5th Cir.2003) ("The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are reliable....").

nosed McKay with biphosphonate-induced ONJ, the record does not support that claim.[52] Rather, in his deposition Dr. Leibowitz specifically disclaimed sufficient expertise to even make a diagnosis, stating that he "didn't know enough about [ONJ] to be certain of a diagnosis, which is why I referred all my patients to Felsenfeld."[53] Thus, it does not appear that Dr. Leibowitz has a specific causation opinion to offer, let alone that it rests on a reliable foundation. Accordingly, he may not testify as to the cause of McKay's ONJ.

## IV. *CONCLUSION AND ORDERS*

1. "Novartis Pharmaceuticals Corporation's ["NPC"] *Daubert* Motion to Exclude Causation Testimony of Plaintiffs' Experts in the *McKay* Case" is **GRANTED IN PART** and **DENIED IN PART**.

2. The court finds the causation testimony of Dr. Kraut and Dr. Sitters to be reliable, and such testimony is therefore admissible.

3. Drs. Ambrose Aboud, Robert Bucy, Nathan Dickerson, Luis Loweree, Jorge Ramos, Panagiotis Valilis and Leibowitz **may not** testify on the issue of causation.

**SO ORDERED.**

---

**52.** Specifically, the McKays state that Dr. Leibowitz "diagnosed ONJ in April 2005," and cite to page 143 of the doctor's deposition. Resp. at 14. That portion of Dr. Leibowitz's testimony actually supports the opposite conclusion, however. Dr. Leibowitz states that he does not remember who diagnosed McKay with ONJ, and notes that he referred McKay to Dr. Felsenfeld. Dr. Leibowitz Dep. at 142–43, attached to ECF No. 67 as Exhibit 14 in 3:06–cv–527.

