Bobby **HARRIS,** Plaintiff

v.

**Stryker SPINE, An Unincorporated Division of Howmedica Osteonics Corp., Defendant.**

**Civil Action No. 3:12CV874TSL–JMR.**

United States District Court, S.D. Mississippi, Northern Division.

Signed June 23, 2014.

Douglas R. Plymale, Plymale Law Firm, New Orleans, LA, Ian A. Brendel, Ian A. Brendel, Attorney at Law, Gulfport, MS, for Plaintiff.

John W. Smith, Bradley Arant Boult Cummings LLP, Birmingham, AL, W. Wayne Drinkwater, Jr., Simon T. Bailey, Bradley Arant Boult Cummings LLP, Jackson, MS, for Defendant.

### MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendant Stryker Spine, an unincorporated division of Howmedica Osteonics Corporation (collectively Stryker),

for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and its related motion to exclude testimony of Dr. Michael Molleston. Plaintiff Bobby Harris has responded to the motions and the court, having considered the memoranda of authorities, together with attachments, concludes that both motions should be granted.

On December 24, 2010, following a single-vehicle accident in which he suffered severe injuries to the cervical spine, plaintiff Bobby Harris underwent cervical discectomy and spinal fusion surgery at University of Mississippi Medical Center in which a spinal plate manufactured by defendant Stryker Spine was implanted in his spine at the C6–7 level. The complaint alleges that device was defective and failed, necessitating emergency revision surgery on February 18, 2011. Plaintiff filed the present product liability action to recover damages he alleges he suffered as a result of defendant's allegedly defective product. In support of his claim of product defect, plaintiff relies on the expert report and testimony of Dr. Michael Molleston. Defendant has filed related motions to strike Dr. Molleston's testimony pursuant to Rule 702 of the Federal Rules of Civil Procedures and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and for summary judgment based on the lack of admissible evidence that the subject device was defective.

A review of the parties' submission reveals the following undisputed facts. On December 22, 2010, Harris was involved in an automobile accident in Noxubee County, Mississippi in which he was ejected from the vehicle. After being taken by ambulance to Baptist Memorial Hospital in Columbus, Mississippi, he was airlifted to the University of Mississippi Medical Center (UMMC) in Jackson, where he was treated by Dr. William Hanigan, a neurosurgeon. Plaintiff's spine injuries were severe, and included a fracture and instability at the C6–7 level. On December 24, 2010, Dr. Hanigan performed an anterior cervical discectomy and spinal fusion at Harris's C6–7 level. In this procedure, the surgeon removes the damaged invertebral disc from the patient's spine and replaces the disc with a bone graft, or "bone plug," that serves as a bridge between the two vertebrae to create a spinal fusion. The surgeon may choose among a number of different types of bone graft materials, including the patient's own bone (autograft) and donor bone (allograft). In plaintiff's case, Dr. Hanigan used natural bone material that had been extracted from a cadaver. The bone graft and vertebrae are often immobilized and held together with metal plates and screws that are used to provide temporary stability until the patient's vertebrae fuse. For plaintiff's December 24, 2010 surgery, Dr. Hanigan selected a metal plate and screws manufactured by defendant, identified as the Stryker Reflex Hybrid Anterior Cervical Plate device.

On his return to UMMC for a follow-up examination on February 14, 2011, a CT scan of Harris's spine was done. The radiology report based on the scan indicated a "Factured intervertebral device at C6–7 with the posterior portion retro-pulse into the central canal resulting in at least mild central canal stenosis and possibly cord compression and cord kinking." The bone graft material had fractured, the screws holding the metal plate had backed out and the bones in plaintiff's spine had failed to fuse. As a result, plaintiff underwent revision surgery on February 18, 2011. At that time, Dr. Hanigan performed a more complicated posterior cervical fusion procedure, in which he removed the original plate, screws and graft material and re-

placed them with more extensive hardware.

Plaintiff filed the present action on December 20, 2012, alleging putative claims of negligence in the design, manufacture, testing, marketing and ·distribution of the subject device; strict liability for alleged manufacturing and design defects, inadequate warnings and breach of implied warranties; breach of express warranty; and negligent and intentional misrepresentation and fraudulent concealment. With Harris's submission in December 2013 of the expert report for Harris's sole expert, Dr. Michael Molleston, M.D., and the subsequent deposition testimony of Dr. Molleston in January 2014, Harris effectively abandoned all but his theories of product liability based on manufacturing defect and failure to warn.[1]

Stryker has now moved to exclude the expert testimony of Dr. Molleston based on Rule 702 and *Daubert*, contending he is unqualified to render opinions about an alleged defect connected to the manufacture of the subject product, and asserting further that his opinions concerning the manufacture of the product must be excluded as they are neither supported by sufficient facts and data nor a reliable methodology. Defendant relatedly moves for summary judgment, contending that since plaintiff must demonstrate that the defendant's device was defective in order to survive summary judgment, and since the only evidence he has offered to prove a defect is Dr. Molleston's opinion, then it follows that since Dr. Molleston's testimony is due to be excluded, plaintiff's claims fail as a matter of law.

The Mississippi Products Liability Act (MPLA), which applies "in any action for damages caused by a product," Miss.Code Ann. § 11–1–63, provides, in relevant part, as follows:

(a) The manufacturer ... of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:

(i)(1) The product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, ...; or

(2) The product was defective because it failed to contain adequate warnings or instructions; ... and

(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

Miss.Code Ann. § 11–1–63(a).

■ As the statute makes plain, to succeed on a claim based on a manufacturing defect, the plaintiff has the burden to

---

1. As defendant notes, Dr. Molleston explicitly affirmed in his deposition testimony that the only opinions he is offering in this case relate to the alleged failure of the subject device as a result of a manufacturing defect. His expert report, prepared by plaintiff's counsel, described opinions Dr. Molleston would offer regarding inadequacy of defendant's product warnings. However, in his deposition, Dr. Molleston stated that he could not recall what warnings were given; that he did not take issue with any particular warning; that he did not know what precautions Dr. Hanigan discussed with plaintiff; and that he had not given and did not intend to give any opinions as to warnings, including warnings that should have been given.

Although Dr. Molleston does not offer opinions on warnings, plaintiff's response to defendant's summary judgment motion indicates that he is pursuing claims both for manufacturing defect and failure to warn.

plead and prove that the product deviated in a material way from the manufacturer's specifications for the product or from a properly constructed product. *Shelter Ins. Co. v. Mercedes–Benz USA, LLC,* 236 Fed.Appx. 45, 47 (5th Cir.2007). *See also Austin v. Bayer Pharms. Corp.,* Civ. Action No. 5:13–CV–28–KS–MTP, 2013 WL 5406589 (S.D.Miss. Sept. 25, 2013) (under MPLA, the plaintiff must show "how the subject product(s) deviated from the manufacturers' specifications or other units"). A plaintiff cannot sustain this burden merely by proof of an accident or injury. *See Williams v. City of Cleveland, Miss.,* No. 2:10cv215–SA–JMV, 2012 WL 3614418, at *4 (N.D.Miss. Aug. 21, 2012) (stating that "under Mississippi law, the mere fact of an accident or injury is not sufficient to prove a product defect") (citing *Wolf v. Stanley Works,* 757 So.2d 316, 321 (Miss. Ct.App.2000), and *McIntosh v. Nissan North America, Inc.,* Civil Action No. 3:07CV60 DPJ–LRA, 2008 WL 4793743, at *3 (S.D.Miss. Oct. 28, 2008)). Rather, to sustain his burden to prove that a product was defective and that such defect caused the plaintiff's injury, expert testimony is generally required. *See McIntosh,* 2008 WL 4793743, at *3 (stating that "expert testimony is generally necessary to prove a product was defective *at least* as to design and manufacture under section 11–1–63.") (citing *Hammond v. Coleman Co., Inc.,* 61 F.Supp.2d 533, 542 (S.D.Miss. 1999)); *see also Cothren v. Baxter Healthcare Corp.,* 798 F.Supp.2d 779, 782–83 (S.D.Miss.2011) (dismissing MPLA claims for design and manufacturing defect based on failure of medical device to function properly based on lack of required expert testimony). In this case, Harris relies on the expert testimony of Dr. Molleston to sustain his burden.

Federal Rule of Evidence 702 allows opinion testimony from a witness "qualified as an expert by knowledge, skill, experience, training, or education" if such testimony will assist the trier of fact and (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702. In *Daubert,* "the Supreme Court explained that Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant." *Johnson v. Arkema, Inc.,* 685 F.3d 452, 459 (5th Cir. 2012). "The relevance prong requires the proponent to demonstrate that the expert's reasoning or methodology can be properly applied to the facts in issue." *Id.* "The reliability prong mandates that expert opinion be grounded in the methods and procedures of science and ... be more than unsupported speculation or subjective belief." *Id. See also Burleson v. Tex. Dep't of Crim. Justice,* 393 F.3d 577, 583–84 (5th Cir.2004) (district court "must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue") (internal quotations omitted). For an expert's opinions to be admissible, " 'they must be based on sufficient facts or data;' must be derived using 'reliable principles and methods;' and must apply those principles and methods to the facts in a reliable manner." *McKay v. Novartis Pharms. Corp.,* 984 F.Supp.2d 647, 653 (W.D.Tex.2012). In *Daubert,* the Supreme Court suggested four factors that trial court judges may wish to consider: (1) whether a theory or technique can be and has been tested, (2) whether it has been subjected to peer review or publication, (3) whether it has known or potential error rates and standards, and (4) its general acceptance in the scientific community.

*Id.* at 593–94, 113 S.Ct. 2786. In determining admissibility, the court must not consider the conclusions themselves, but rather the manner in which the expert arrived at his conclusions. *Id.*

 Stryker challenges Dr. Molleston's qualifications, contending that although his qualification as a neurosurgeon might enable him to give medical opinions on the procedure performed, the need for surgical intervention, and Harris's medical condition and prognosis, he is not qualified to render an opinion as to a manufacturing defect in the subject product. Before admitting proposed expert testimony, "the court must … gauge whether the 'witness's qualifying training or experience, and resultant specialized knowledge, are sufficiently related to the issues and evidence before the trier of fact that the witness's proposed testimony will help the trier of fact.'" *United States v. Wen Chyu Liu,* 716 F.3d 159, 167 (5th Cir.2013) (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.04(1)(b) (Joseph M. McLaughlin ed., 2d ed.1997)). Stryker notes that Dr. Molleston conceded he has no training or education in metallurgy, material sciences or bioengineering. Moreover, his testimony established that he had not reviewed the written materials/design specifications for the product; he did not know the exact model or size of plate used; he was unaware of the materials used to make the plate; he was unaware of the type of screws used; and he was not familiar with the manufacturing process. Nevertheless, plaintiff maintains that Dr. Molleston is amply qualified to render opinions in this case as to a manufacturing defect based on his extensive practical experience in spinal surgeries, spinal products and cervical spinal plates, including spinal plates like the product used in this cause, and his work as a consultant to companies involved in the design of spinal plates, including a competitor of Stryker that he co-founded, Spinal USA. The court recognizes that a proposed expert's lack of training on or experience with the *specific* product at issue does not necessarily render him unqualified to render an opinion about that product. *See Wen Chyu Liu,* 716 F.3d at 168–69 (explaining that "'an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight'") (quoting *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1100 (10th Cir.1991)). However, he still must have some relevant education, training or experience. *See Martin v. Fleissner GmbH,* 741 F.2d 61, 64 (4th Cir.1984) (upholding admission of expert knowledgeable in pertinent areas of engineering design although unfamiliar with the particular product at issue) (cited in *Wen Chyu Liu,* 716 F.3d at 168 n. 22). In this case, particularly in light of his admitted lack of knowledge concerning the properties and manufacturing process relating to the device at issue in this case, Dr. Molleston's use of products similar to, or even the same as the product at issue here, and his involvement in the design (though not the manufacture) of similar products, likely do not qualify him to analyze and explain how the device implanted in plaintiff's spine was manufactured improperly. *See Morritt v. Stryker Corp.,* 973 F.Supp.2d 177, 187–88 (E.D.N.Y.2013) (holding that the plaintiff's orthopedic surgeon who lacked training or expertise in biotechnology, manufacturing processes, or materials science was not qualified to offer opinion regarding the source of wear of polyethyene tibial insert, and observing that the plaintiff had offered "no explanation as to why Dr. Montalbano's clinical experience and personal knowledge of the subject knee prosthesis and its component parts afford him the

competency to opine on an alleged defect in its manufacturing"); *Alexander v. Smith & Nephew, P.L.C.,* 98 F.Supp.2d 1310, 1316 n. 3 (N.D.Okla.2000) (excluding testimony of expert upon finding he "lacks the qualifications necessary to render opinions regarding the mechanical behavior of the Rogozinski device while implanted. Dr. Farrar has demonstrated absolutely no training, education, or experience in biomechanics or any related field."). However, regardless of whether he may be qualified to provide opinions in this case, his opinions are inadmissible as they are not relevant or reliable.

■ Stryker argues that Dr. Molleston's testimony as to a manufacturing defect is inadmissible because he failed to employ a reliable scientific methodology to reach his conclusions. It submits his opinions are unfounded and purely speculative because he never examined the subject plate; he is unfamiliar with the features and specifications of the subject plate; he admitted that plates fail for reasons unrelated to defects, and he could not explain why, or even how, the plate in this instance failed to perform as intended.

Following the revision surgery in February 2011, Dr. Hanigan discarded the hardware and the bone graft material that he removed from plaintiff and therefore, the subject device was not available for examination by Dr. Molleston. Notwithstanding this, Dr. Molleston's expert report states the following opinions:

- "the Stryker Reflex Hybrid Anterior Certical Plate system device implanted into Mr. Harris on December 24, 2010 failed by breaking";
- the device system "was defective, the device failure that occurred ... would not normally occur unless the device was defective"; and
- "the bone plug inserted into Mr. Harris had fractured as a result of the

[device system] failure," which caused him pain and necessitated a second surgery to remove the device and repair the damage it caused.

The report further recites that Dr. Molleston "considered other potential causes besides the device failure to determine whether" plaintiff's injuries were caused from the device failure alone, and "[b]ased on differential diagnosis, [he was] able to rule out other causes of Mr. Harris's injuries." It further states that plaintiff "did not cause the injury from the hardware failure."

When asked in his deposition to explain what he meant by the statement that the device "failed by breaking," Dr. Molleston clarified that he did not mean the device physically broke into pieces but only that "it didn't do what it was supposed to do, so in a way it broke.... It failed. It didn't do what it was supposed to do." When asked to explain the basis for his opinion that the plate was in some way defective, he stated simply that "[i]t didn't hold up.... It pulled out from the C7 vertebral body.... The screws didn't hold." "The device is designed to hold," "it should have held," and it "failed" since it did not hold. However, he did not purport to state with any degree of certainty what he believed caused this to occur.

Dr. Molleston's report further asserted that the "device failure that occurred ... would not normally occur unless the device was defective." But it is clear from his deposition testimony that this statement is not at all accurate. Indeed, in his testimony, Dr. Molleston acknowledged that there are many reasons unrelated to product defect that can cause such devices to fail. In this regard, he agreed that spinal plates such as that used in plaintiff's December 2011 surgery are only designed to provide temporary support until the bone fuses

and takes over that role. That is, the support of the plate is limited because eventually the bone will heal, which is indeed the point of fusion surgery. He agreed that if the bones do not fuse properly, the plate may fail; and he admitted there are "a lot of reasons why the bone doesn't fuse." However, Dr. Molleston claims to have performed a "differential diagnosis" (or as plaintiff calls it, "differential etiology") by which he ruled out other possible causes for the failure of the device unrelated to a potential product defect, which has led him to conclude that the failure was the result of a product defect.

Stryker submits that a differential diagnosis is not a valid or accepted means of establishing a product defect, in general, or a manufacturing defect in particular, but that what Dr. Molleston has done in this case does not qualify as a valid differential diagnosis in any event. "A differential diagnosis is a patient-specific process of ruling out potential causes of an illness as unlikely, until one cause remains." *Morritt*, 973 F.Supp.2d at 189 n. 9; *see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 468 (5th Cir.2012) ("A reliable differential diagnosis ... generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.") (internal quotation marks and citations omitted).

▉ Plaintiff's burden in this case is to prove that there existed a manufacturing defect which caused the product to fail. He seeks to prove that a defect in the product caused the product to fail through differential diagnosis; but he must first show that there was a defect in the product, which in the case of an alleged manufacturing defect, requires proof that the product deviated in a material way from the manufacturer's specifications for the product or from a properly constructed product. *See Shelter Ins. Co.*, 236 Fed. Appx. at 47. "Where an expert employs differential diagnosis to 'rule out' other potential causes for the injury at issue, he must also 'rule in' the suspected cause, and do so using 'scientifically valid methodology.'" *Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 254 (2d Cir.2005) (citation and some quotation marks omitted). Dr. Molleston has done neither. That is, he has failed to rule out a number of possible causes of the device failure unrelated to any product defect and, as well, has failed to identify a defect that was a cause or the likely cause of the failure.

Dr. Molleston arguably ruled out some possible alternative causes for the failure of the device. He testified that improper placement or positioning of the screws or improper positioning of the plate can cause failure. He stated, though, that "the placement of the screws looked proper on the ... pre-plate failure x-rays" and "[t]he op note doesn't describe anything unusual about the way the plate was implanted or any trouble that they had with the screws or—the placement of the fixation."[2] He also agreed that insufficient bone strength of the vertebrae into which the screws are placed can result in failure but testified

---

**2.** The court notes that although Dr. Hanigan testified in his deposition that the first surgery went reasonably smoothly, the placement of the spinal plate was difficult because of the nature of plaintiff's injury. In the court's view, Dr. Molleston's reliance on the absence of anything in the surgical notes to indicate any difficulties or problems as a basis for excluding other potential causes is problematic. Dr. Molleston did not speak with Dr. Hanigan and thus did not ascertain, in fact, whether there had been problems or difficulties with the procedure.

that "[t]he bone looked strong enough on the CAT scans and x-rays that were done."

However, he acknowledged a number of other potential causes of failure which he did not rule out. For example, Dr. Molleston agreed that strenuous physical therapy or post-surgical trauma could have an effect on fusion and the functioning of a spinal plate; but he could not recall when plaintiff underwent therapy, he did not know what kind of physical therapy plaintiff engaged in, and while he was unaware of any trauma, he never spoke with plaintiff and simply assumed he had no trauma since none was mentioned in the medical records.[3] Further, as defendant aptly points out, Dr. Molleston did not inspect the graft material which fractured, and he did not address, much less rule out, whether the graft material caused or contributed to the failure.[4] That is, he failed to ascertain or address whether poor bone stock quality of the allograph used by Dr. Hanigan in the first surgery may have contributed to the failure.[5] *See Coleman v. Danek Med. Inc.*, 43 F.Supp.2d 637, 650 n. 23 (S.D.Miss.1999) (finding that characterization of doctor's "methodology" as a "differential diagnosis" was "an obvious overstatement of the 'analysis' performed" where doctor "did not rule out other causes" of the alleged injuries).

In addition to failing to rule out potential causes, Dr. Molleston was unable to identify and rule in a manufacturing defect as the cause of plaintiff's injury. That is, although he posits that the device must have been defective since it failed, he has not suggested how it was defective or how it failed. Dr. Molleston expressed in his deposition that he considered it significant that the radiologist used the term "fracturing" to describe what occurred, yet he freely admitted he did not know what the radiologist meant by this term, stating, "Whether that means he saw a fracture in the plate where the screw interfaces with the plate or he saw a fracture in the plate itself I can't tell you." Asked specifically if the plate fractured, he responded, "I don't know if the plate fractured or the screw plate interfaced fractured or what portion was fractured. I just know the radiologist uses the phrase in his report." As defendant notes, Dr. Molleston did not speak with the radiologist to determine what he meant by the term "fractured",

3. Plaintiff argues in response that Dr. Molleston ruled out these possible causes, but plainly he did not. He could not rule these out simply by assuming they did not occur.

Furthermore, as addressed in more detail *infra*, plaintiff also declares in his response to the summary judgment motion that defendant "has provided no evidence that Mr. Harris caused the subject hardware to fail, nor is there any record evidence that trauma or another occurrence (besides a product defect) caused the subject hardware to fail." Obviously, it is not the defendant's burden to prove that plaintiff did not cause the hardware to fail or to prove that plaintiff was injured due to a cause besides a product defect; rather, it is plaintiff's burden to prove that he was injured as a result of a product defect.

4. Plaintiff asserts that Dr. Molleston ruled out poor bone quality of the allograph, but the testimony which he cites refers only to "[p]oor bone quality on the part of the host," the "host" obviously being Harris. He did not discuss the relative quality of the bone plug or allograph.

5. Dr. Hanigan also testified that bones can fail to fuse, leading to failure of the device, "for reasons having nothing to do with the device itself." He identified as some of the things that can lead to failure of the fuse "disease, types of different fractures, the extent of the fractures, bone problems, problems with healing in general, and diseases associated with that, technique. They can all enter into it—and they can all cause a problem." Dr. Molleston did not purport to address or rule out all, or even most, of these potential causes.

and plaintiff chose not to depose the radiologist. Equally importantly, Dr. Molleston testified that he had viewed the February 2011 CT images himself and "didn't see any fracture" of the plate or the screws.

Dr. Hanigan also testified that at the time he implanted the device in December 2010, he had a chance to handle and inspect it and did not recall seeing anything problematic about the device that would have given him pause. Likewise, when the device was removed in the second surgery, he handled the plate and screws and saw no evidence of any problem with the device. Like Dr. Molleston, Dr. Hanigan did not know what the radiologist meant by the term "fracture" either, though he suggested the radiologist may have been referring to the bone plug, or allograph, which did fracture. He testified that he reviewed the CT scan done on February 14, 2014 and saw "no evidence of a fracture" in the plate or screws.[6]

Other than a fracture of the plate or screws, of which it is apparent Dr. Molleston has no evidence, the only possibilities he offered as to how the device may have been defective and as to what may have caused it to fail were that it "could have been . . . an improper angle of the screws at the interface with the plate hull. . . . Or it could have been improper locking of the screw with the locking device that Stryker uses for the screws." He did not suggest that either was likely and he admitted he "[could] not tell you which of these choices caused the screws not to hold."

■ Based on all of the foregoing, the court concludes that Dr. Molleston's proposed testimony on the issue of manufacturing defect is not reliable and will therefore be excluded. Stryker contends that without expert testimony, Harris's claim fails as a matter of law and must be dismissed. Plaintiff's principal position in response to the motion is that Dr. Molleston's testimony meets the requirements of Rule 702 and *Daubert* and is therefore admissible to prove the elements of the claim. He argues, though, that even in the absence of Dr. Molleston's evidence, defendant is not entitled to summary judgment since a product defect may reasonably be inferred from defendant's own product warnings. More to the point, Harris notes that the warnings for the subject product state: "Postoperative fracture of bone graft . . . can occur due to trauma, *the presence of defects*, or poor bone stock." (Emphasis added). He reasons that since the fracture of the bone graft noted on his February 14, 2011 CT scans was not caused by trauma, or at least that there is no evidence that it was; and since the fracture of the bone graph was not the result of poor bone stock, or at least there is evidence that the allograph used by Dr. Hanigan was of poor bone stock; then it follows that "the only explanation for the post-operative fracture · of the bone graft"—and resulting hardware failure— "was a defect in the Defendant's product." He submits· that at a minimum, based on defendant's own warning, the fact that the bone graft fractured is circumstantial evidence of the defective quality of defendant's hardware. He continues, arguing that the bone graft was itself a component part of the .defendant's product, for which defendant is strictly liable if it rendered defendant's product as a whole defective. Plaintiff's arguments are patently without merit for myriad reasons.

---

**6.** Dr. Hanigan also expressed that while the hardware failed, "it failed for reasons other than the hardware itself."

Among other reasons, no reasonable argument can be made that defendant may be found liable based on a defect in or caused by the bone graft, or allograph. The allograph selected and used by Dr. Hanigan in the first surgery was not manufactured or sold by defendant, nor was it incorporated by defendant in its final product.

Furthermore, as the court has indicated *supra*, it is not the defendant's burden to show that there was no trauma or that the bone stock was not of poor quality. Thus, even if the warning were somehow relevant on the issue of a manufacturing defect—which it is not—it would be incumbent on plaintiff to affirmatively demonstrate that the failure was not caused by trauma and was not caused by poor bone stock. This, he has not even attempted to do.

Additionally, there is no reasonable basis for interpreting the reference to "the presence of defects" in defendant's warning to anything other than the graft material or intervertebral body above or below the level of surgery; and it is plainly unreasonable to interpret this phrase as referring to a defect *in the defendant's own hardware*. And even if this phrase could reasonably be interpreted as suggested by plaintiff, and even if plaintiff had presented evidence that the failure was not caused by trauma or poor bone stock, it would not follow that the failure was caused by a product defect, as the list of possible causes of bone graft failure in the warning does not purport to be exhaustive.

Lastly, it is the plaintiff's burden to prove that the device "deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturer's specifications." Miss.Code Ann. § 11–1–63(a). Plaintiff cannot sustain his burden to prove a defect based on nothing more than a negative inference from (at best) ambiguous language in a warning. As he has offered no other admissible evidence in support of his claim for manufacturing defect, that claim will be dismissed.

Plaintiff's claim based on inadequate warnings also will be dismissed. Simply put, it is manifest that there is no warning that plaintiff reasonably claims should have been given which was not given or of which Dr. Hanigan was unaware and which he failed to impart to plaintiff.

Therefore, based on all of the foregoing, it is ordered that defendant's motions to exclude the testimony of Dr. Molleston and for summary judgment are granted.

A separate judgment will be entered in accordance with Rule 56 of the Federal Rules of Civil Procedure.